Case number 2014, Court of the House in 76, Albert H. Schempp v. GC Acquisition LLC, et al. We're going to proceed 15 minutes per side. Mr. Zyman, two minutes, please. May it please the Court, good morning. My name is Jeff Zyman. I am counsel for the appellant Albert Schempp. Mr. Schempp is 82 1⁄2 years old now, and he had a lifetime pension promised to him by his company back in 1991. That pension was terminated, we assert, in an illegal fashion. Mr. Schempp worked at a company called Glaston Corporation, a plastic processor and manufacturer in the industrial electrical insulation industry. It's kind of a success story. He worked for the company for 32 years, working his way up to become its president. In 1991, on the verge of his retirement, he and three other then-current executives were promised a retirement benefit for their lifetime under the Glaston Corporation Supplemental Executive Retirement Plan A. Now, just a curiosity question, but you say they were promised. They actually were running the place, weren't they? I mean, they sort of promised themselves. In the record, it is an offer of a pension by the corporation. I understand there's a board. They were executives in the company. The corporation approved it. Well, the question is not whether it was appropriately approved by the corporate formalities. The question is the decision-making about the corporate action came from a group that included Mr. Schempp. Are you referring to when it was originally adopted, SIRPA? Well, the idea of doing it. The idea of doing it was partially Mr. Schempp's idea, although I'm not sure that's absolutely clear from the record itself. But in any event, that agreement was negotiated and was put into place properly by the corporation. There's no dispute in the record that SIRPA existed. The dispute appears to be about Section 9.3 of that agreement, which specifies that any amendment or termination of that plan made after the effective date of that plan had to be agreed upon in writing in advance of the change by the board and by Mr. Grant and Mr. Donnelly, G.E. Grant and R.E. Donnelly. And both of those individuals were also participants. So is it your position if those two guys had died that there could never have been any kind of an amendment, a modification, a termination? No, Judge Batchelder. Thank goodness both of those individuals in the record were alive at the time, and they still apparently seem to be alive. I think it would have been a much more difficult conversation and a difficult legal issue if a provision in that agreement became impossible. There is nothing in the record to indicate it was impossible. And the point is that the actions by the subsequent owner in that case to attempt to terminate that plan – and recall at the time this was done, Mr. Shemp received a letter on November 14, 2005, after having received his benefits for years and had in essence about a month to consider the fact that they had already terminated. Well, wouldn't the time to have raised any challenge to the modification of benefits have been at the time it was made? No, Judge. Or he allowed the limitations period of the due plan to expire? No, Your Honor, because the claim that we are raising is not under the new plan, and the court focuses on this word modification. I think we ought to focus on modification. But he agreed to the new plan. He accepted its benefits, correct? And it was unlike this original plan. It was an agreement between Mr. Shemp and the company, right? It was a different type of plan because it was— But it was an agreement to which he agreed, the company agreed. It was an agreement between the two of them. Correct, as opposed to the Cert A, which is an offering of a pension plan like a 401k plan or other retirement plan. But the fact, Judge, is that at the time, everybody thought that Cert A had been properly terminated. Nobody made the inquiry that my firm made during a claims process consistent with Section 503 to make inquiry about whether Cert A was terminated properly in accordance with its express contractual terms. Well, that's still an open question. That doesn't have anything to do with his delay. But the same uncertainty that hangs over your position could have hung over these persons, too, and influenced their decision to go with the modification. Forget it. What do you want to call it? Modification. The new arrangement, let's call it that. At the time, everyone's pension had been shut off, Judge. They had counsel. The counsel did not engage in a process to make inquiry as to the propriety of the termination. It was done. It was a fait accompli. People were not receiving their pensions. They agreed to a subsequent agreement. This Court has directed, and I hope will, to follow the strict contract law in interpreting these contract terms. The second contract, the 2006 agreement, is important for what it says and for what it doesn't say. This Court, in the Shoemaker v. A.K. Steel case, which I did not, I apologize, reference in my brief, but after we have the opportunity to see who's on the panel, you get to expand your scope of how many ERISA cases you're going to study before you file. But that case is very clear because it talks about a contract is not only important for what it says. It's also important for what it doesn't say. Ma'am, I'm sorry. I just can't resist straying into something that really, just to ask a question, why would the composition of the panel have anything whatever to do with the preparation you would do? We just didn't cite a particular case that we didn't think was relevant at the time, Judge. I apologize. But if we look at the 2006 agreement. Why does the composition of the panel make a case relevant? I'm just suggesting we happen to notice a case. Well, then the composition of the panel had nothing to do with it. Correct. Yes, Your Honor. That's not the first thing you said. I apologize. The term modification, as it appears in the 2006 agreement, says what it says and means what it means. But what it also – it cannot be certain things. Clearly, it cannot be a settlement agreement, a waiver, or a release. Very similar to the Schumacher case. If the specific terms and conditions are not there, then it's not there. Please note that we all, all of those of us in the courtroom who practice law, know how to draft a settlement agreement. It would have been simple to put a phrase into that agreement that says, and Mr. Schumpeter's all prior claims against the company. It would have been simple to say, and he settles and relates to it and resolves any prior claims. It would have been simple to do that. As a strict focus of contract instruction on that case, it is very clear that those words simply do not appear. And if we're going to take somebody's attention away, it should be done with express authority. It should be done clearly. It should be done without any debate. And everyone knows how to draft a settlement agreement. This was not a settlement agreement. Let me ask you this. There was one or two, at least, name changes. Were these the changes, were they changes in names, or did an arm's length third party come in and buy the company? Or just what was, what occurred there? When Mr. Schumpeter and the others had this plan offered to them for a lifetime pension, it was owned by Kobe Steel. Subsequent to that, it was purchased by GC Acquisition, which is one of the defendants. After this all was done, and we assert in our complaint that this was done in anticipation of a sale. After this all was done, it was eventually then sold about a little over a year to Raichling in a stock purchase deal. But Raichling didn't accept this prior, the 2006 agreement obligation. In that agreement, they left it with GC Acquisition. And those payments under the 2006 agreement were made. You mentioned the issue of modification. Can Mr. Schump have agreed to a modification of SIRP A, contractually or otherwise? We know that Mr. Green and Mr. D'Ampetro purportedly authorized the change by signing a document, or at least they say they signed it. There's no evidence that we don't have a signed document for the authorization to terminate SIRP A. Weren't they in the same boat as your client? No, actually they were not in the original SIRP A. They were subsequent management. They were not in the original SIRP. They had no authorization, and they were not the people mentioned in SIRP A section 9.3 authorized to make the change. And when you say at some point everybody stopped getting pensions, does that mean rank and file employees and so forth, or just these group of four? Judge, there were actually two supplemental plans. One was A, one was B. B is not before the court, but there was a group that also had their pension shut down. We don't know the terms and conditions of that supplemental pension B. It's not relevant to us. Were there any other pensions other than these two supplemental plans? Yes, there were. Were those shut down? There was a regular other pension that was paid to Mr. Schump when he retired in 1991. But in 2005, were those shut down? I do not know whether those—there's no facts in the record to indicate whether those existed or did not exist at that time. Even if we take what the district court said at page 10, docket record 384, which gives many options as to what this 9.3 of SIRP A could have said, even under that what I would call extrinsic evidence dissertation about what 9.3 says, Mr. Schump didn't have authority to modify SIRP A. Just like a participant in a 401k plan can't modify their plan without authority, and just like a beneficiary of a trust can't modify. Now, the defendants talk about the fact that Mr. Schump could have agreed to anything because Mr. Schump has a right to contract freely. But he can only agree to what he is allowed to agree to. He's not allowed to agree to modify 9.3 of the SIRP A, but he is allowed to settle, release, or waive. But those words don't appear in the 2006 agreement. Well, there's only four people that were affected by this, right? The plan only covered four people. The SIRP A at issue before this covered four people. Okay, and what happened to the other three? There's nothing in the record to indicate what happened to the other three, Your Honor. Did they sign on to SIRP B? No. It's not in the record, but at least one or two of them were actually cashed out at some point in time. Were what? Cashed out. They were given a cash settlement. Oh, okay. We don't have the fact in the record. Okay. There was no discovery in this case. This was a summary judgment motion, as the Court's aware. In your complaint, you're asking for monthly retirement benefits under SIRP A from January 1, 2006 to the present in a single lump sum payment. Are you saying that you should have gotten the SIRP A payments and the 2006 agreement payments? Yes, Your Honor. We look at the contract and interpret the contract by its strict terms. SIRP A was not properly terminated. If it wasn't properly terminated, it still exists. Now, grant it. Now, in the 2006 agreement, though, your client makes it pretty clear that he understands that this is in lieu of, so he shouldn't be held to that? No. I don't think he makes it clear. And that agreement contains a very explicit statute of limitations. He hasn't brought a claim, you know, I mean, until way past that. Your Honor, I recognize that, but I'm not making a claim. So what he's done is he's now contesting an agreement under which he received benefits for a number of years. No, he's contesting that SIRP A was not properly terminated, and he has rights under SIRP A. The 2006 agreement is not what he's contending. And if you say that he settled and he waived his rights under SIRP A, then you're agreeing that you're writing language into the 2006 agreement that simply doesn't exist there. SIRP A was presumed terminated. The first paragraph of the recital says that SIRP A was terminated. The original plan was terminated. The consideration for the 2006 agreement was not settlement, waiver, or release. The consideration was past service with the company. And that last paragraph does not say he released his claims. He has no right to modify that prior agreement. He's not an authorized person in 9.3, and he more than any beneficiary in a trust has authority. Doesn't he have the authority to give up his right to receive the benefits even if he has no right to modify the plan itself? If he was going to expressly waive his ERISA benefit rights, he could have done so in this agreement with a very simple phrase that said, and Mr. Shemp hereby releases all his claims or settles all his claims. But he had the legal authority to do that. You may contend he didn't do it. Yes, Judge Stevens, he had the legal authority to do it, and he did not do it. Thanks, counsel. Good morning. May it please this honorable court, my name is Stephen Dunn, and I represent the appellees. Judge Gibbons, I heard you mention a few moments ago in another matter that I was observing that actions speak louder than words. And in this particular matter, the actions and the words of Mr. Shemp confirm the district court's ruling in this particular matter. Mr. Shemp entered into voluntarily, knowingly, with competent counsel from a prominent Cleveland law firm, a valid bilateral modification of a previous agreement. When two parties enter into an agreement and subsequently enter into another agreement, that second agreement takes the place of, supersedes. Is it strictly speaking one agreement superseding another? Because, I mean, Mr. Zimon at least makes the point that the plan was not exactly an agreement between Mr. Shemp and the company. Is the court's focus whether the original agreement or the original contract document was an agreement between two parties? What is the nature of the plan?  The parties to the original plan, Judge Gibbons, were the company on the one hand and the four individuals on the other. Are they signatories to a contract that effectuated that plan? Or is it just some, I mean, I had the notion that the replacement to the plan differed from the plan in that it was clearly a contract signed by both individuals. I thought that the original SERPA was more in the nature of a benefit provided by the company to these individuals. Yes, Your Honor, I think that it could be that. I also think that the four individuals could be intended beneficiaries. Well, okay, but that means they're intended, they're third-party beneficiaries or whatever. But they're not, their status differs under the two arrangements. Perhaps that's the case, but I don't know that that changes the result that we have here. It may not. It's just not strictly accurate to describe it the way you are describing it, I don't think. Yes, Your Honor, and I appreciate that distinction. I think the focus, though, is that Mr. Shepp, both his actions and his words confirm for us that the district court got this exactly right. Mr. Shepp, with competent counsel, negotiated his rights, understood what he may have been entitled to, clearly appreciated and was advised about his options, legally and otherwise. He could have filed a suit back in December of 2005 because his payment benefits under SERPA terminated. Let me stop you right there because that's a question that I'm not clear on. He was notified in 2005, if I remember, that Glastick was terminating SERPA. Now, let's change the scenario a little bit and say that the day after he got that notification, he started a lawsuit. Did Glastick have the right to unilaterally terminate this pension? Glastick did, under Section 9.3, have the ability to stop payments under the SERPA document. Yes, it did. And that was part of the original plan that the four people were involved with on the thing. Yes, sir, under Section 9. I'm not trying to put words in your mouth, but you'll be paid as long as we continue to want to pay you or until the board wants to pay you. Or otherwise in accordance with the terms of the SERPA document. Yes, sir. And Mr. Shepp understood this. And so when his payments ended in December of 2005, he had choices. He had options. He understood his rights and with competent counsel who advised him about his rights, who reviewed the relevant documents and analyzed what he could have done, his options at law or otherwise, his counsel with him, Mr. Shepp, negotiated with the company a new arrangement, a new deal. And what is most important, the actions of Mr. Shepp. He accepted payments under the new deal in the exact same monthly amount, $4,556 per month, every single month from January 2006 or actually March of 2006, retroactive to January of 2006, forward for more than seven years without complaint, I might add. In fact, the correspondence of the parties that's relevant to the time period here and was considered by the district court properly for the purpose of understanding what the party's intent was more clearly, the district court noted that in a letter from Mr. Shepp's counsel, which Mr. Shepp himself provided to counsel for my client at the time, for example, January 17, 2006, the counsel refers to the document, the 2006 agreement, the new deal between the parties, as, quote, a bilateral contract with the company. What could be more clear than that? A week later... Go ahead. Excuse me. I'm sorry, sir. January 24, 2006, Mr. Shepp's counsel contacts counsel for the company at the time. This is all in the record, referring to, quote, a proposed settlement arrangement that the parties would reach. Counsel points out that, boy, there's not release language in the subsequent agreement. What was the subsequent agreement? If it were not, as it says by its own words, a modification of the original agreement, what was it? If it was not an intent by the parties, as confirmed with the correspondence that I'm referencing that's in the record, as the district court correctly pointed out, a settlement of whatever it was that happened in December of 2005 when payments under the original plan stopped. Let's stop there a minute because if they sent the letter, however they notified him that they were terminating, why did they enter into some new arrangement at all? It suggests that they felt there may have been some irregularity in the termination. You used the word settlement a moment ago. Yes, Your Honor. The company had no obligation, as the district court pointed out, to enter into the new agreement. But perhaps the company at the time thought that Mr. Shemp would bring an action. And even as an offer in compromise to avoid the uncertainty, the expense, and the lost opportunity cost, for example, associated with litigation, the company, for those reasons perhaps, maybe others, decided to enter into an agreement with Mr. Shemp that the company really did have no obligation to enter into. But it did that for him in pursuance of the terms of the second agreement, for example, which continued all the way through July of 2014. The plaintiff appellant, Mr. Shemp, received an additional nearly $500,000 in payments. Under the original plan document, whether it's an agreement or otherwise, the plaintiff appellant received post-retirement, in his supplemental executive retirement plan, an additional $1 million on top of all of the benefits that he received pursuant to his ordinary regular retirement plan that I heard counsel refer to moments ago that until oral argument here this morning, I didn't even know Mr. Shemp had been receiving. So we're talking about a man who had been the chief executive officer, Judge Guy, of Glaston Corporation from 1977 until 1992, had served with the company from 1959 until his retirement until 1992, millions of dollars in post-separation benefit payments. And here we are asking the court, apparently, as I understand the answer from moments ago, to receive double payments every single month from 2006 forward, and then under the previous document, payments from apparently 2006 until the end of his life, even though he knew, pursuant to an option that he selected in the original document, that there was a different arrangement because under the original document, the plaintiff did not select the ability to appoint a beneficiary to receive whatever payments he might receive. But under the second agreement, the 2006 agreement, and this is one of the three forms of consideration that the district court noted exists to support the subsequent agreement in 2006, Mr. Shemp, the plaintiff appellant, had the ability to appoint a beneficiary to receive any payments that he was not allowed to receive if he were to pass away before receiving all 103 monthly payment benefits that he received, which, by the way, were in the exact same amount as the monthly payment benefits that he received under the original document. What happened? Did they make this same arrangement, they being the company, with the other three people? Your Honor, it's my understanding that two of the other three people may have received a lump sum payment. He did say something about a lump sum. Yes, sir. And if you were still wondering, I could… No, no, no. It's just curious how these things play out. Yes, sir. And so, again, to return to the point here, and I'm yellow now, so I want to make this point again. It's the actions and the words of Mr. Shemp that confirmed that the district court's ruling was exactly right. For example, in the January 24, 2006, letter by email from counsel for Mr. Shemp at the law firm of Tucker Ellis in Cleveland, a fine law firm, I believe, Mr. Shemp's counsel notes that the 2006 agreement, Your Honors, is a proposed settlement arrangement. And, by the way, in that correspondence, counsel for Mr. Shemp indicates that he's going to be receiving, counsel for the company, that is, the letter that Mr. Shemp's counsel wrote to Mr. Shemp, which is also part of the record. That's the January 17, 2006 letter that I mentioned moments ago. Finally, on January 31, 2006, Your Honors, and this is what I found to be perhaps most striking, counsel for Mr. Shemp refers to the 2006 agreement, Judge Batchelor, as a proposed settlement agreement in lieu of the current SERP plans. What other conclusion could the parties have clearly intended with the 2006 agreement if it were not going to be, as counsel for Plaintiff Appellant himself points out so clearly, a proposed settlement agreement in lieu of the current SERP A plans? SERP, excuse me, the 2006 agreement, as the district court noted, the following shall construe the terms and conditions of this agreement. It's in the very first introductory paragraph, even above the word recitals. This document clearly says, quote, it is the intent of the parties to this agreement, a modification of the original plan. The original plan is defined as SERP A. Mr. Shemp, through counsel, negotiated this 2006 agreement, understood its terms, understood that there was a value to him in receiving $500,000 over the course of more than seven years under this document in lieu of pursuing his litigation rights if he were to have decided to pursue those. On the last page of this document, Mr. Shemp, and this is, again, evidencing that this is a bilateral modification, a valid bilateral modification of the original plan document. Mr. Shemp himself signs this document in his own pen. He writes next to his signature the date, 3-11-2006. For more than seven years, Mr. Shemp received every single payment on time, in full, in certified funds or otherwise that he immediately took to his financial institution, presumably without complaint. Even in June of 2012, this letter is also in the record, in June of 2012, Mr. Shemp himself wrote to the company and he said, in summary, I'm wondering when my payments are going to end. Didn't they have a 2014 termination date or something of that nature? Yes, sir, it did. And he sort of waited right up to bumping into that date and then this all started. That's exactly right, Your Honor. And so even as late as 2012, he knew that his payments would end. Four days later, on June 8, 2012, the company wrote back, in summary, Dear Mr. Shemp, your payments will end in July of 2014. He received his last payment, the supplemental additional payment under Section 4 of the 2006 agreement in the amount of approximately $40,000 in July of 2014. He accepted that payment without complaint and here we are today. My time is up. I appreciate your time and your consideration. We would ask that you please affirm the decision of the District Court. Thank you. Thank you. May it please the Court, we're looking at this backwards. We don't interpret a contract first by talking about how it arrived. We look at the contract first. We look at each contract in a vacuum. We assess what that contract terms, what they mean. Why, if this was a settlement agreement, doesn't it say it? Yes, Mr. Shemp had competent counsel. Maybe there's a reason why it doesn't say settlement agreement, waiver, or release in the 2006 agreement. We have to, as looking at this contract interpretation, we assess it purely in a vacuum. Do we understand what it says? Do we know what it says? Do we know what it not says? And this Court, I hope, will find that the plain language of the 2006 agreement cannot be backwards created into a settlement agreement. It is easy to have done so and that wasn't the case. The information that's been submitted with respect to settlement negotiations, I've already argued, is not admissible. Settlement negotiations are supposed to be outside the scope of the evidence the courts to consider. The court went backwards. The district court, unfortunately, looked to see that this was a settlement. If it was a settlement, it would have been easy to say that it was. Now, Judge Batchelder, you asked me, does he get both? The fact is the court in equity under ERISA 50283 allows the district court to apply equity. I'm not suggesting that if the facts demonstrate equity should apply, that there might be some kind of a set-off. I understand that. But I should also have the opportunity to prove what I've alleged, which was this is a ruse. This was a set-up designed to position the company for sale. And then I have my countervailing equity argument to make to the district court, and the district court can in equity determine. What I'm asking this court to do is say, look, at the clear terms of SERPA, you didn't do it right. Well, the reason why they did something doesn't have anything to do with the effect of what they did. I agree. We should look specifically at the terms first, and we only go to extrinsic evidence if we can't understand. What does that paragraph mean that uses the word modification? It's a 409A provision. I apologize. I see that my time is up. May I have leave to finish my? Finish your thought. The thought is that that provision relates to 409A, a complicated tax provision that relates to the taxability of benefits, and it refers to the prior agreement in order to make sure the IRS understands this deferred compensation agreement that Judge Gibbons had referenced is a different kind of agreement, and she's correct, is more like a pension so that the taxing authority should not tax them on the entire benefit when it's executed. Thank you. I appreciate the time. Thank you, counsel. Case will be submitted. Clerk may call the roll.